**AMERICAN AUTO. ASS'N (Incorporated) et al. v. SPIEGEL.**

No. 242, Docket 22622.

United States Court of Appeals Second Circuit.

Argued May 4, 1953.

Decided June 25, 1953.

772

Noel Rubinton, New York City, Rubinton & Coleman, Brooklyn, N. Y., Samuel Rubinton, of Brooklyn, N. Y., of counsel, for appellant.

Leo T. Kissam, New York City, Eric Nightingale and Joseph M. O'Loughlin, New York City, of counsel, for appellees.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a summary judgment enjoining his use of the plaintiffs' trade-mark. The action was brought by the American Automobile Association and the Automobile Club of New York to protect the Association's trade-mark, "AAA" —enclosed in an oval—from infringement by the defendant, who operates a small automobile filling station in Brooklyn. The defendant, a citizen of New York, does not dispute that he displays the mark in public view at his station, or that he does so in order to protect his business from the competition of filling stations that the plaintiffs allow to display it. He asserts, however, that the plaintiffs are not entitled to enjoin him, because they themselves are using the mark: (1) in violation of Article 8, § B36–103 of the Administrative Code of the City of New York; and (2) as a means to effect an unlawful restraint of competition between filling stations. The facts, as disclosed by the pleadings and affidavits, are as follows. The Association is a Connecticut corporation, not organized for profit, but generally to promote favorable conditions for private motoring: among its activities are advocating legislation, road-making, making and distributing road maps and lists of accredited service and repair stations, and other conveniences for the motoring public. It has a membership of 2,700,000. The Club is a New York corporation—one of a number of subsidiaries, all subject to the control of the Association. It grants "affiliation" to filling stations like the defendant's, when it is satisfied as to their dependability and general character; and it distributes gratuitously to them maps and a number of other articles that it buys from the Association, which the "affiliates" in turn distribute gratuitously to their customers. It gives leave to "affiliates" to display the trademark, but it periodically inspects them, investigates complaints against them, corrects their mistakes, and supplies their inadequacies. The Association has registered fifteen trade-marks that cover a great variety of articles, none of which, however, the defendant distributes except road maps, and possibly other prints or posters.

The two violations of law with which the defendant charges the plaintiffs are these. The first is that each "affiliate" enters into a written contract with the Club agreeing to pay to it "a dividend of 10% on the net amount of all purchases of merchandise or services" made from the "affiliate" "by members of the Club." This is done by the "affiliate's" buying coupons from the Club,

and delivering to every member of the Association coupons for ten per cent. of any purchase he may make. If the member presents the coupons to the Club, the Club will redeem them, so that the member finally receives a discount of ten per cent. upon the posted cost of gasoline, or upon any other purchases he may make from the "affiliate." The defendant alleges that, as to gasoline, this is a violation of the section of the Administrative Code, that we have cited, which provides that no one shall sell "gasoline unless such seller shall post * * * on the * * * pump * * * a sign or placard", of prescribed dimensions, "stating clearly * * * the selling price," and which further provides that no other "sign or placard stating or referring directly or indirectly to the price or prices of gasoline" shall be displayed. The argument is that the trade-mark publicly states, though "indirectly," to all members of the Association that they can buy gasoline at a discount of ten per cent; and that this unlawful practice is so direct a consequence of the plaintiffs' use of the trade-mark as to prevent its protection by injunction under the well settled principle that equity will not intervene to prevent the invasion of a private right which the plaintiff is using for an unlawful purpose. The defendant goes further. He asserts that, although an "affiliate's" contract with the Club forbids him to give any discount to any of his customers in the sale of gasoline, in practice the "affiliates" do not so limit themselves; but, in order to avoid the odium of discriminating between their customers, they pay a cash discount to those who are not members of the Association. He says that this practice the plaintiffs know to exist, and have made no effort to repress; and in consequence the trade-mark has come to mean to all passing motorists that the "affiliate" displaying it will in one way or another give them a discount from the published price of ten per cent. The second violation of law with which the defendant charges the plaintiffs is that, although the Club selects "affiliates" in part because of their general reliability and competence, an applicant for "affilia-

tion" must satisfy another condition. If within a quarter of a mile of his filling station there is already an "affiliate" who sells gasoline of any kind, or within a mile an "affiliate" who sells the same kind of gasoline as that which the applicant sells, the Club will refuse the application. This practice, the defendant argues, is a violation of the Anti-Trust Acts, and for that reason too a court of equity will not protect the mark.

 Finally, the defendant, not only denies that he infringes any of the plaintiffs' trade-marks, but insists that their claim that he does is not "substantial" enough to support any dependent jurisdiction of the court under the Judiciary Act.[1] The only section of the Trade-Mark Act that defines the infringement of a trade-mark[2] declares that it consists of a use of the mark "in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or deceive purchasers as to the source of origin of such goods or services". The plaintiffs had, therefore, to prove that in selling his goods the defendant used one or more of their marks "on" them, or "in connection with" their sale, in such a way that his use was likely to lead purchasers to suppose that the "source of origin" of the goods he sold was the plaintiffs. Since all the plaintiffs' marks are for articles that the Club distributes gratis to its customers, the plaintiffs must point to some articles that the defendant sells which, because of his use of the mark, are likely to be taken by the buyer as the plaintiffs'. The nearest approach to any such goods is the maps that the defendant distributes to his customers when they buy gasoline; and it would indeed stretch the language to say that he "sells" maps to his customers at all, for they do not enter into the price of the gasoline that he does sell. However, even if we were to accept his distribution of them as a "sale," by no possibility could we hold that the customers were "likely" to suppose that they came from the plaintiffs. The only evidence is that the defendant received the

1. Section 1338(b), Title 28, U.S.C.A.

2. Section 1114(1) (a), Title 15, U.S.C.A.

maps he gave away from the Socony Vacuum Company, and presumably they bore on their face that company's name. Be that as it may, it is quite untenable to suppose that, because he displayed the plaintiffs' mark in front of his station, his customers were led to think that the plaintiffs were the source of the maps. Possibly upon a trial that may be made to appear, but this record does not give the slightest warrant for any such conclusion. Not only was there no support for a finding of infringement, but the claim was too "unsubstantial" to support the defendant jurisdiction over the claim for "unfair competition." If the judgment is to stand, it must rest in some other section of the Act than § 1114(1)(a).

The Ninth Circuit in two recent decisions has indeed held that § 1126 gives jurisdiction to the district court over all claims by those engaged in interstate commerce, against unfair competition, even though the infringing acts are not themselves in interstate commerce.[3] The Court of Customs and Patent Appeals approved this doctrine *obiter* in In re Lyndale Farm, 186 F.2d 723, 38 C.C.P.A., Patents 825; on the other hand, three district courts have held the contrary.[4] In Dad's Root Beer Company v. Doc's Beverages, 2 Cir., 193 F.2d 77, a majority of this court expressly reserved expressing any opinion on the point, because it was not necessary; but we cannot avoid deciding it here, because, if the doctrine is right, the district court certainly had jurisdiction, even though the defendant's business was altogether intrastate. The argument is that, although § 1114(1)(a) may require the registration of a mark and its infringement by some act in interstate commerce, § 1126 gives the district court jurisdiction, whenever the plaintiff is engaged in interstate commerce with which the defendant unfairly competes. That this is the "intent" of the Act is to be gathered from the concluding paragraph of § 1127, which states that one of a number of its purposes is "to protect persons engaged in such commerce against unfair competition". Even if that language stood alone, and could not be reasonably referred to some more specific section, we should long hesitate to find in it warrant for so sweeping an assertion of Congressional power, adding to the jurisdiction of federal courts all instances of unfair competition with interstate commerce, regardless of the amount involved, or the citizenship of the infringer, § 1121. However, when we do find, as we do, an express section that deals with "unfair competition," it seems to us that we should attribute the language quoted to that section, particularly when we remember that the infringement of a trade-mark is itself a form of "unfair competition." Before yielding to the literal meaning of the words we should examine the Act to see whether it does not elsewhere define more specifically its intent on this subject.

Subsection 1126(h) declares that "Any person designated in subsection (b) as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies * * * for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition." Since this subsection is limited to "person designated in subsection (b)", we look to that subsection to learn its scope. It grants to aliens and to others, domiciled, or doing business, in a foreign country "the benefits * * * of this chapter to the extent and under the conditions essential to give effect to any such conventions and treaties"; i. e., to those conventions and treaties that the subsection has just mentioned. The first two of these are specified conventions of 1883 and 1929, and the third is described as "any other convention or treaty relating to trade-marks, trade or commercial names or the repression of unfair competition." Since only persons so described are entitled to protection against "unfair competition,"

3. Stauffer v. Exley, 184 F.2d 962; Pagliero v. Wallace China Co., 198 F.2d 339.

4. Ross Products, Inc., v. Newman, D.C., 94 F.Supp. 566, Ryan, J.; Old Reading Brewery v. Lebanon Valley Brewing Co., D.C., 102 F.Supp. 434, Follmer, J.; Ronson Art Metal Works v. Gibson Lighter Manufacturing Co., D.C., 108 F.Supp. 755, Edelstein, J.

no one may invoke the remedies otherwise available under the Act to whom some "benefit" has not been granted by a "convention" or a "treaty." Since subsection (b) is confined to aliens and non-residents, the plaintiffs must bring themselves within subsection (i), upon which alone jurisdiction over this action must rest. It provides that United States citizens "shall have the same benefits as are granted by this section to persons described in subsection (b) of this section." That means that citizens shall have whatever "benefits" subsection (b) gives to aliens; and, so far as concerns "unfair competition," those "benefits" are limited to such as may be found in some "convention or treaty relating to * * * the repression of unfair competition". The purpose of this subsection, quite clearly, is no more than to extend to citizens and residents those "benefits" that any "convention or treaty" gives to aliens, including the same remedies for "protection against unfair competition" that subsection (h) gives to aliens. (The same purpose appears in subsection (g) as to "trade-names.") Having implemented such "conventions and treaties" by subsections (g) and (h) in favor of aliens, Congress very naturally wished to put citizens on an equal footing. We are forced to the conclusion that the Act does not give jurisdiction to the district courts over an action brought by any plaintiff with whose interstate commerce the defendant has unfairly competed.

█ The judgment must therefore be reversed. However we will not dismiss the complaint, but will remand the cause to the district court for further proceedings in accordance with the foregoing opinion. Conceivably upon a trial the plaintiffs may be able to prove that the defendant has either infringed some one or more of the plaintiffs' trade-marks, or at least that they have sufficiently proved a "substantial * * * claim under the * * * trade-mark laws" "related" to the plaintiffs' "claim of unfair competition", to bring the action within the Judiciary Act.[5] We do not now decide anything about the defences, except that if the court should conclude that it has jurisdiction over the action, it should not attempt to dispose of the merits summarily, but only after a trial. We think that the defences present issues that are by no means frivolous, and that may be decided only after the facts are fully developed.

Judgment reversed; cause remanded.